Gary Bruce SMOOT, Appellant–Respondent,

v.

Annette SMOOT, Appellee–Petitioner.

No. 33A01–9012–CV–522.

Court of Appeals of Indiana, First District.

Dec. 2, 1992.

Dale E. Hunt, Dunnick, Teagle & Hunt, Muncie, for appellant-respondent.

Kimberly S. Dowling, Muncie, for appellee-petitioner.

ROBERTSON, Judge.

Gary Bruce Smoot (the husband) appeals following the granting of a dissolution of marriage to his former wife, Annette, after five years of marriage. The appeal comes after a long and embittered custody battle over the couple's four-year-old son, Aaron, and amidst allegations on the part of the husband that the wife and maternal grandfather had sexually molested the child, allegations which ultimately led to the child's placement in foster care during the pendency of the dissolution proceedings. The final decree of dissolution, which fully incorporated the trial court's special findings of fact and conclusions of April 25, 1990, was issued July 25, 1990. The husband perfected this appeal, challenging the matters of custody and visitation.

The conflict has not died. The husband obtained a change of judge and petitioned this court for leave to prosecute a petition to modify custody and support, which was granted June 27, 1991. In November, 1991, before a ruling had been made upon the husband's petition for modification, and despite three earlier contempt citations for failing to return the child after a scheduled visitation, the husband retained physical custody of Aaron following a scheduled visitation. On November 11, 1991, the third trial judge to have presided over the case, Special Judge Thomas Newman, on an ex parte petition to return the child and to terminate visitation rights filed by the wife, directed that the child be returned to the wife, terminated the husband's visitation for an indefinite period and set a hearing on the matter for November 22, 1991. The wife then filed a rule to show cause why the husband should not be held in contempt of court. The husband filed combined motions to withdraw the ex parte order, for emergency custody pending the hearing and to consolidate all matters for hearing. The court scheduled all matters for hearing on November 22, 1991. At the hearing which followed, the court found the husband to be in contempt of court and then reconvened to hear evidence on the husband's petitions for custody. The court granted the wife's motion for judgment on the evidence, denied a change of custody, and continued in force the order terminating the husband's visitation. This court has granted the husband a stay of the order terminating his visitation pending the resolution of his appeal.

## I.

### Jurisdiction

On February 14, 1992, the husband filed a petition with this court for leave to file a "supplemental record" in which he alleged "[t]hat proceedings in the trial court appear to have ended and by Praecipe timely filed in the trial court a Supplemental Record of those proceedings has been prepared and is ready to be put in final form as a Record of Proceedings and tendered to this court." A copy of the praecipe referred to in the motion was not attached to the petition. This court granted the husband's request to file a "Supplemental Record." Having received that record, and the parties' briefs, it now appears that the husband has combined the issues arising as a consequence of his divorce and those arising from the proceedings in November, 1991, in a single appeal. Before us is a motion for dismissal from the wife which alleges that this court is without jurisdiction over those additional matters informally consolidated with the pending appeal because the husband's praecipe was not timely filed.

■ "An appeal is initiated by filing with the clerk of the trial court a praecipe designating what is to be included in the record of the proceedings. The praecipe shall be filed within thirty (30) days after the entry of a final judgment or an appealable final order ... Unless the praecipe is filed within such time period, the right to appeal will be forfeited." Ind.Appellate Rule 2(A). The failure to file in a timely manner is a jurisdictional defect requiring dismissal of the appeal. *Sullivan v. American Casualty Co.* (1991), Ind.App., 582 N.E.2d 890, 893. *See Sears, Roebuck & Co. v. Hutchens* (1973), 260 Ind. 561, 297 N.E.2d 807, 808.

■ The record reflects that the trial court made a final ruling on the wife's petition for termination of visitation and her motion for the husband to show cause why he should not be held in contempt of court on November 22, 1991. The proceeding initiated by these petitions, although filed under the same docket number as the original petition for divorce, was one in which new rights based upon a new set of facts or changed circumstances were adjudicated. The proceedings were in essence a separate action by which the wife sought modification of the earlier decree of dissolution and disposed of all issues raised therein. For purposes of appeal, the judgment rendered on the petitions was a final judgment appealable as such under the rules of civil procedure. *Haag v. Haag* (1959), 240 Ind. 291, 303, 163 N.E.2d 243. It was thus imperative that to pursue an appeal from the rulings made on November 22, 1991, the husband file a praecipe within thirty days or by December 23, 1991. The record contains a praecipe file-marked December 5, 1991, asking for the inclusion of all documents and evidence relating to the proceedings held on November 22, 1991. The husband's appeal thereon was therefore timely filed.

■ We observe, however, that a supplemental record is intended to be used to correct omissions or misstatements in the record before us. Ind.Appellate Rule 4(B). By his supplemental record, the husband has not supplied omitted documents or sought to conform the record of the divorce with the truth. He has simply combined two final appealable orders in one appeal. In the interests of judicial economy and because the wife has had the opportunity to respond to the additional matters presented and to do so will not alter the outcome of our opinion, we will address the issues raised on the merits.

## II.

### Custody

The crux of the husband's argument with respect to the matter of custody is that the trial court "simply ignored the most credible and persuasive evidence on the issue of custody including the wishes of the child and the clear and unquestionable evidence of the very close and loving relationship between the child and Appellant as well as the clear evidence of the psychological problems of Appellee. The court relied upon almost exclusively the report of custody evaluator Margaret Purvis, who indicated that cases involving charges of child molesting are not in her expertise."

The trial judge who heard the evidence relating to the determination of custody, the Honorable Thomas R. McNichols, issued extensive findings in support of his decision to place sole legal custody of Aaron with the wife. These findings reflect the overriding concern, held by the court, that Aaron, "a delightful child," who had strong positive relationships with both parents, was at risk of being emotionally and developmentally harmed if access was denied by either parent to the other.

The court sought and expressly adopted most of the advice offered by the court-appointed custody evaluator, as it is permitted by statute to do. Ind.Code 31–1–11.5–21(e); I.C. 31–1–11.5–22. But, our review of the evidence reflects, as the court found, that the court's findings and conclusions are amply supported by evidence from both lay and professional witnesses, in addition to that of evaluator Purvis and the psychologist associated with her, Dr. Roll.

By the time of the final hearing, the wife had undergone over two years of therapy

and had made herself a more functional adult. (R. 445–6, 449, 455, 496). She had the capacity to empathize with Aaron and put his interests before her own, while her former spouse did not. (R. 458, 475, 492, 504, 525). She had demonstrated a willingness, despite the allegations made against her, to work with the husband to further her son's interests. (R. 475, 478, 595). She had a close relationship with her son, although different in nature from that of the child's father. (R. 544). She had recognized the need of her son to be appropriately intellectually challenged; and, she was capable of working with the personnel at the Ball State University day care her son attended, where the child was flourishing, while the husband apparently could not. (R. 101, 504).

There is considerable disagreement among the witnesses over whether Aaron was ever sexually molested and the wife's involvement in the alleged molestation. The evidence of molestation is argued extensively in the husband's brief. Of course, the wife categorically denied the truth of the allegations made by her former spouse. She testified that she had never even washed the child in the manner alleged. A number of professional witnesses, among them, the custody evaluator, Mrs. Purvis, (who, we point out, testified that she did have expertise in treating sexual abuse victims); the wife's psychotherapist, Dr. Hayes; the child's psychotherapist, Dr. Spencer; and an independent psychiatrist whose opinion had been solicited by the husband, Dr. Davidson, all expressed the view, either in writing at the final hearing on the issue of custody or at one of a number of earlier hearings, that they did not believe the alleged molestation had occurred, (R. 96, 383, 473, 478–500, 502, 621), for various reasons: the wife showed genuine concern over her son's well-being, development, and interests, a characteristic not typically displayed by child molesters (R. 452, 504); the child had not exhibited fear when in the wife's presence (R. 386, 489, 539); the child had been questioned by so many mental health professionals, child welfare, and law enforcement personnel, that the veracity of his statements could no longer be ascertained from his delivery of them, (R. 480, 500); that the circumstances of the molestation varied so much over the course of the child's therapy that he was not believable, (R. 383); and that the child's notion of the truth as it related to the alleged molestation had become extremely conflicted by reason of his strong attachment to his parents, both of whom he believed to be truthful. (R. 383–4). Likewise, although there was evidence that Aaron had, during the pendency of his parents' separation, refused to go to his mother and demonstrated genuine fear of her, (R. 364), the record as a whole suggests reasons other than the alleged molestation for this fear, such as an incident during which the child was led to believe that the wife had struck the husband with her car, (R. 548), and perhaps the child's own recognition that his father was emotionally hurting because of the mother's actions in obtaining the divorce. All of the witnesses were in agreement that the circumstances surrounding the divorce were having an adverse effect upon Aaron. (R. 472–3, 505, 530, 545, 548, 558, 679).

As we mentioned, the husband's witnesses testified that Aaron did not want to live with his mother, did not have a particularly close relationship with her and tended to withdraw from her. The husband also offered testimony from mental health professionals and a law enforcement officer who believed the child's allegations.

■ We will not belabor this opinion by engaging in the process of evaluating the strengths and weaknesses of each of the witnesses' opinions. The trial judge ably and properly performed this function, stating in his findings that "the substantial amount of evidence" submitted on the issue, "replete with inconsistencies and evidentiary conflicts" has "of necessity, been considered and weighed by the Court accordingly," resulting in the Court's finding that "there simply is inadequate evidence of probative value to support a finding that the molestation alleged by the husband actually occurred," "that any such incidence of molestation might occur in the future or that the husband's fears with respect to

such potential are, in fact, well-founded." The trial court also carefully weighed the evidence concerning Aaron's wishes, all of which came second-hand from witnesses who observed Aaron while he was in his father's care, and expressly accorded Aaron's purported wishes no weight as it was the trial court's prerogative in its sound discretion to do.

■ In a case like this, we will strictly adhere to our standard of review which is to affirm the trial court if it cannot be said that the trial court abused its discretion, that is, if it cannot be said that the trial court's decision with respect to custody is clearly against the logic and effect of the facts and circumstances before the court. *Eyler v. Eyler* (1986), Ind., 492 N.E.2d 1071, 1075. As we have already indicated, the trial court sought to act in the best interests of Aaron by applying the statutory considerations. I.C. 31–1–11.5–21. The court's directives as a condition of full legal custody in the wife, that the wife continue to encourage and support access to the father, that the child continue to attend the Ball State University day care which had been so beneficial to him, and that Aaron continue in counseling with Dr. Spencer, are safeguards imposed by the court which demonstrate that the court's decision is reasonably based upon all the evidence in furtherance of Aaron's best interests. Our review of the record does not convince us that a mistake has been made either with respect to the child molesting allegations or legal custody generally. The trial court's decision to award full legal custody to the wife is therefore affirmed.

### III.

### Child Support

Mr. Smoot also contests the amount of child support he has been ordered to pay. He maintains the court's decision "is clearly erroneous in that the evidence presented was incorrect and the Court failed to properly apply the Indiana Child Support Rules and Guidelines in its determination of child support." The trial court adopted the wife's version of the parties' respective incomes and her computations, resulting in an award of $124.00 per week from the husband or 62% of the total basic child support obligation.

The wife's reported income comes totally from wages. She testified that beginning in July, 1989, she would be making a gross annual income of $21,450.00. Her actual gross income in 1989 was $20,284.00. The parties' disagreement over the wife's weekly gross income is $.50.

■ The husband's income is generated from farming operations and a rental house. He offered no evidence other than the documents attached to his worksheet in support of the weekly gross income figure he reported for himself of $288.00. The wife suggested that the court average the husband's income over the five-year period of their marriage because their income from farming varied so greatly from year to year. She arrived at a gross weekly figure by taking the net income figure reported to the IRS and adding deductions taken for depreciation, insurance not associated with the business, and utilities associated with the residence.

The wife's formula is consistent with Ind.Child Support Guideline 3(A)(2) which defines weekly gross income from self-employment as gross receipts minus ordinary and necessary business expenses. Specifically excluded from ordinary and necessary expenses by the guideline is depreciation. Benefits that reduce living expenses such as free lodging are not actual expenses of the business. Child Supp.G. 3, commentary. Certainly, payment by the business of utilities for the residence and insurance premiums unrelated to the operation are significant and reduce personal living expenses. It is not the intent of the guidelines to recognize these types of tax shelters. *Id.*

The wife also testified concerning the husband's practice of holding crops grown one year over for sale in the next to ensure that he did not pay too much in taxes in any one year. The wife testified that in 1988, the husband reported a loss of $52,-460 but had held over $106,449 in income to report in 1989. Thus, the reported loss of

$52,460 was misleading, because the couple actually earned $75,607 in 1989.

The guidelines caution the courts to use care in determining income of self-employed individuals. Documents can be misleading particularly for those "who have the ability to defer payments, thereby distorting the true picture of their income in the short term." When in doubt, the drafters advise that income tax returns for the last two or three years be reviewed. Child Supp.G. 3(C), commentary.

The husband did not challenge the accuracy of the wife's figures or offer any evidence to contradict her assertions. The trial court's resolution of the discrepancy between the husband's reported income and the wife's testimony that it varied greatly from what had been reported is supported by the evidence. We do not perceive an abuse of discretion in the determination of child support.

## IV.

### Termination of Visitation

Mr. Smoot contends that the court erroneously terminated his visitation when, after the final decision of custody had been made and visitation reestablished, he again refused to return Aaron to his mother. The husband maintains first, that the court's action cannot be upheld because it was made ex parte, without notice or hearing, and second, that the court's action was "illegal under I.C. 31–1–11.5–24(b)" which provides that a court shall not restrict visitation unless it finds that the visitation might endanger the child's physical health or significantly impair his emotional development. With the observation that the husband has not devoted much attention to the law relating to this issue, we will limit our review to a few brief comments.

Mr. Smoot cites the United States and Indiana Constitutions generally in support of his contention that he was denied due process by the decision to terminate visitation which was made without notice or an evidentiary hearing *before* the ruling. Our response is two-fold. First, if the process utilized by the court were in some manner constitutionally defective, it might behoove the husband to so demonstrate by citing us to some relevant authority. Ind.Appellate Rule 8.3(A)(7). Second, the trial court had before it substantial evidence developed only a year earlier that the husband's self-help actions, frequent violation of court-ordered visitation and his refusal to let the allegations of molestation die were damaging to the child's emotional well-being and development.

There is the testimony of Mrs. Purvis, the court-appointed custody evaluator. Citing her belief that children of divorce will be emotionally at risk for the rest of their lives if the parents do not engage in a cooperative parenting relationship, Mrs. Purvis recommended that to protect Aaron's relationship with each of his parents, the court impose sanctions if either parent refused to foster the child's relationship with the other parent. With respect to the husband, Mrs. Purvis recommended that visitation cease if evidence were produced to show that he was programming the child to be alienated from his mother; he refused to return the child to the mother's custody at the appropriate time and place; he chose to disregard further orders of the court; the parents exhibited inappropriate behavior, i.e. verbally fighting and downgrading one another in the presence of the child; or the child's therapist observed that the child was under emotional duress as the result of the child's visitation with the husband. Mrs. Purvis suggested however that the court adopt an approach toward visitation which permitted the husband liberal contact with his son with the hope that by participating as much as a noncustodial parent could in his son's upbringing, the husband would be less inclined to seek his own remedies.

Dr. Hayes, on the other hand, offered his view that the prognosis of the husband altering his past behavior of putting the child at risk in order to fight his battle with the wife was not very good, and recommended no visitation until Aaron entered the first grade. By waiting until then, Aaron would have had the opportunity to develop, would have better verbal commu-

nication skills and would be better able to separate fantasy from reality.

At the hearing on November 22, 1991, the wife demonstrated, and the husband freely admitted, that he had become frustrated with the judicial system's response to their situation and had decided even before he had picked Aaron up for visitation on Friday, November 8, 1991, that he would not return the child.

■ The trial court had the statutory authority to preclude visitation altogether upon a showing that visitation by the husband would significantly impair Aaron's emotional development. I.C. 31–1–11.5–24; *Stewart v. Stewart* (1988), Ind.App., 521 N.E.2d 956, 962, *trans. denied.* Notwithstanding that such a showing had been made, the court adopted Mrs. Purvis' proposal to award visitation on a set schedule with the proviso that should the husband or the mother not exhibit a good faith effort, the court would consider the imposition of severely-limiting sanctions as envisioned by Mrs. Purvis.

The husband therefore cannot genuinely claim that he did not have notice the court would act so swiftly if he failed in good faith to comply with the court-ordered visitation plan or that the decision to revoke his visitation was made wholly without evidentiary support. The trial court's findings in the dissolution proceeding plainly demonstrate that the court found visitation under the conditions created by the husband, and not the court, would endanger Aaron's emotional well-being. The court permitted visitation only under the terms specified in the decree. When the husband violated the court's orders on visitation for a fourth time and, we might add, refused to return the child even after he was directed on November 11, 1991 to do so, the court merely enforced an existing decision. For these reasons, and in the absence of authority establishing that the process utilized by the court was constitutionally invalid, we conclude that the court complied with the dictates of I.C. 31–1–11.5–24 and properly discontinued visitation. We add that, while the loss of visitation is the loss of a significant parental right, it is not necessarily and need not be a permanent loss. *Stewart,* 521 N.E.2d at 962.

## V.

### Contempt

Mr. Smoot raises two issues with respect to the finding of contempt: first, that the allegations contained in the wife's pleading by which she sought to have the husband appear and show cause were not verified as required by I.C. 34–4–7–8; and, second, that the court erroneously failed to consider any argument that the husband acted in good faith to protect his child.

■ We agree with the wife that error in the issuance of the rule to show cause without oath or verification as required by statute could not have injured the husband's substantial rights. Ind.Trial Rule 61. Mr. Smoot admitted at the hearing on November 22, 1991, that he had failed to return Aaron as he was required to do by the terms of the decree and continued to keep Aaron even after he knew about the November 11, 1991 order requiring him to return the child.

■ We also agree with the wife that the trial court did not abuse its discretion in rejecting the argument of the husband's counsel that the husband had acted in good faith belief that his son was being subjected to harm. Mr. Smoot testified on direct examination that he decided before his visitation began and before a second set of criminal charges had been filed against the wife that he was not going to return Aaron to his mother following his visitation. As we indicated above, he stated he did not return Aaron because he was frustrated with the judicial system. It was not until cross-examination, in response to leading questions from his attorney, that the husband "testified" that he was acting in his son's best interests, to protect him. Indiana Code 34–4–7–9, cited by the husband, requires discharge only if the offender shows that no contempt was intended. Mr. Smoot's own testimony establishes that he willfully and knowingly disobeyed two court orders. The trial court abused no

discretion in holding him in contempt of court.

## VI.

### Attorney's Fees

Lastly, the wife urges that we award her appellate attorney fees pursuant to Ind.Appellate Rule 15(G). She advises us that such fees are appropriately awarded when a claim or defense is "frivolous," i.e. that it is taken primarily for the purpose of harassment, the attorney is unable to make a good faith and rational argument on the merits of the action, or the attorney is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. *Elbert v. Elbert* (1991), Ind. App., 579 N.E.2d 102, 114.

■■■ While we acknowledge that there is considerable evidence the husband was intent on harassing his former wife, even at the cost of his son's well-being, we are not convinced that this appeal was prosecuted solely for that purpose. The record also contains a substantial amount of evidence supporting the charges of child molestation, which in turn favors an award of custody in the husband. When these kinds of issues predominate, it is appropriate to ask this court to take another look at the evidence and the decision-making below to ensure that a mistake has not been made. As we have indicated, the record in this case evinces that all of the evidence was thoughtfully weighed and considered. Aaron's interests were at all times placed before those of the parties. Nonetheless, under the circumstances, review of the custody determination was warranted. We decline to award appellate attorney fees.

Judgment affirmed.

RATLIFF, Senior Judge, and SHARPNACK, C.J., concur.