Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 29 2012, 9:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD K. MCCLELLAN**
McClellan & McClellan
Muncie, Indiana

ATTORNEY FOR APPELLEE:

**PERRY D. SHILTS**
Shilts Law Office
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WILLIAM N. GERARD, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 90A04-1112-DR-642 |
| | ) | |
| ALTHEA L. GERARD, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE WELLS SUPERIOR COURT
The Honorable Frederick A. Schurger, Judge
Cause No. 90D01-0806-DR-32

**August 29, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

William Gerard (Father) appeals the award of attorney and expert witness fees to Althea Gerard (Mother) in an action involving the modification of Father's parenting time with the parties' minor child, C.G. On appeal, Father claims that the trial court abused its discretion by ordering him to pay these fees, totaling over $14,500.

We affirm.

Mother and Father were married in January 1999 and separated in June 2008, when their only child, C.G., was seven years old. During the parties' two-year separation, Father had little contact with his daughter. At the beginning of her parents' separation, C.G. began therapy with Christine Ottaviano Shestak to deal with anxiety and other issues.

On July 1, 2010, the trial court entered an order approving the marital settlement agreement executed by the parties. The agreement granted Mother sole custody of C.G. and provided for parenting time as follows:

> [Father] and [C.G.] shall attend family therapy sessions with Christine Ottaviano Shestak commencing Monday, June 7, 2010, in order to work toward a goal of secure interpersonal exchanges between [Father] and child. Said family therapy shall continue between [Father] and [C.G.] until otherwise jointly determined by Christine Ottaviano Shestak and [Father's] counselor, Dr. Glenn Davidson.
> Christine Ottaviano Shestak and Dr. Glenn Davidson shall jointly determine when [Father] shall commence to have supervised parenting time with the parties' minor child. Any supervised parenting time shall initially be in a community setting and in the presence of Norman Glass and Joan Nusbaumer as the supervisors.
> Christine Ottaviano Shestak and Dr. Glenn Davidson shall jointly determine when [Father] shall commence any unsupervised parenting time. Each time the parenting time is increased it will be required to be reported to the Court by Christine Ottaviano Shestak and Dr. Glenn Davidson. If at any time Christine Ottaviano Shestak and Dr. Glenn Davidson cannot agree on the issue of parenting time, then the issue shall be submitted to the Court for determination.
> [Father] and [Mother] agree that the intent and basic goal of the above-described phase-in parenting time is for the reunification of [Father] with

child.

All of the Indiana Parenting Time Guidelines shall be followed except as above-described. [Mother] shall continue to attend her counseling sessions with Ann Flaningam, the maximum amount as said counselor feels necessary. [Father] shall continue to counsel with Dr. Glenn Davidson, the maximum amount as said counselor feels necessary. [C.G.] shall continue to counsel with Christine Ottaviano Shestak, the maximum amount as said counselor feels necessary.

All of the parties hereto will make a conscious effort not to denigrate any other party hereto most particularly in the presence of [C.G.] [Father's] counselor, [Mother's] counselor, and child's counselor will be required to exchange information amongst each other in order to facilitate reunification of [Father] with child.

*Appellant's Appendix* at 23-24.

Father had two family therapy sessions with Shestak, C.G.'s established counselor, prior to the dissolution decree being entered. These occurred on June 7 and 22, 2010. At the end of the second session, Mother, Father, and Shestak began discussing supervised parenting time on July 11 and follow-up family therapy on July 13. A disagreement arose between Father and Mother regarding whether one or two supervisors were required to be present during parenting time. Shestak indicated that the supervised parenting time should be in compliance with the dissolution decree at which time Father angrily advised that he had not yet signed the agreement and accused Shestak of trying to keep his daughter from him.

In a follow-up letter to counsel sent June 23, Shestak provided in part:

I gave a note to both [Father] and [Mother], stating that I would recommend a 4 hour, supervised parenting time on Sunday, July 11, 1-5 p.m., if the divorce order with the parenting time provisions is signed, and if the parenting time is set up according to the provisions of the court order. I have promised this child safe contact with her father. I came to court and spoke with Dr. Davidson and both of you about how to ensure that the child's anxiety can be managed while increasing her time with her father. Without a signed divorce decree, which includes the parenting time recommendations we all discussed and agreed upon on June 1, I cannot guarantee this child any degree of

3

emotional or physical safety. Therefore, I cannot recommend that the parenting time proceeds as planned unless the divorce decree is signed.

I am copying this letter to Dr. Davidson so that he is aware of my high level of clinical concern about [Father's] lack of ability to control his outbursts and the impact it had on [C.G.] The angry outburst occurred with no warning and continued with little ability to redirect his verbal output. By the time I remembered that the child was present, she had turned white and was frozen in place, looking very anxious. Having witnessed the intensity of the anger and the rapidity with which it occurred, I have a high level of clinical concern that Dr. Davidson and [Father] work on this particular clinical issue so that the child can continue her progress toward decreasing the anxiety she feels when the topic of spending the night at her father's house, without her mother's presence [sic]. I continue to have a high level of clinical concern that without such change in [Father's] behavior, [C.G.'s] emotional functioning will continue to be significantly impaired by his behaviors toward her and toward others while in her presence.

*Exhibits* at 54. Father executed the agreement on June 30, and the agreement was approved by the trial court as set forth above.

By July 2, Shestak had learned that Father, by advice of counsel, secretly audio taped the two family therapy sessions in June. After speaking with Dr. Davidson and consulting the ethics departments of the American Counselors Association and the American Mental Health Counselors Association, Shestak cancelled the upcoming supervised parenting time and suspended family therapy until a court order could be issued directing Father not to tape the sessions in violation of HIPAA.[1]

---

[1] In a lengthy letter sent to the parties on July 2, Shestak stated in part:

There can be no parenting time on July 11, despite the fact that the judge has signed the order because there can be no follow-up family session on July 13. There can be no unsupervised contact between father and child until [Father] is able to demonstrate that he understands the need to put his daughter's emotional health before anything else. There can be no family sessions until [Father] is able to demonstrate with Dr. Davidson that he is capable of entering into a therapeutic relationship, understands the concept of confidentiality, and can use the time to promote his relationship with his daughter, and unless and until there is a court order mandating that there will be no covert taping of the session[.]

4

On July 7, less than a week after entry of the dissolution decree, Father filed a petition for citation against Mother. As grounds for contempt, the petition provided in part:

> 3.     That the Counselor provided by [Mother] for the benefit of [C.G.] refuses to reinstate family counseling sessions in this matter unless there is an agreed entry wherein [Father] shall not tape the sessions and further that all family counseling sessions will be held at Ms. Shestak's office.
> 4.     [Father] believes that it would be potentially detrimental to he and his daughter to meet any further in Ms. Shestak's office and he has no objection to not taping without notification so long as Dr. Davidson is present.
> 5.     [Father] believes that the child's counselor did misrepresent the events of the last session in her report of June 23, 2010 to the extreme detriment of [Father], namely the accusations of anger regarding [Father].
> 6.     [Father], at the direction of [his counsel] and using said counsel's equipment, recorded the two sessions that were very beneficial to all concerned.
> 7.     That [Mother] herein has willfully denied [Father] the parenting time he that he [sic] is entitled under the current MARITAL SETTLEMENT AGREEMENT currently in place, as well as a little over two years, all without any reason being presented and all against the goal of reunification between [Father] and [child].

*Exhibits* at 36-37.

Thereafter, on July 21, Mother filed a petition for citation against Father, alleging in part:

> 3.     [Father] attended two (2) family therapy sessions…wherein he taped said sessions without consent…. Said family sessions have been suspended by Ms. Shestak until [Father] enters into a Court Order prohibiting him from taping any family therapy sessions, the sessions shall take place at Ms. Shestak's office, and [Father] shall continue in therapy with Dr. Glenn Davidson.
> 4.     [Father] has failed, neglected, and refused to comply with the terms of the Marital Settlement Agreement entered by the Court on July 1, 2010. Specifically, [Father] has failed to cooperate with Ms. Shestak in the family therapy sessions. Further, [Father] has failed to continue to counsel with Dr. Glenn Davidson.

---

*Exhibits* at 57.

5

*Id*. at 39. This same day, Mother also filed a request for production of electronically stored information, seeking copies of all tapes made by Father during the family therapy sessions.

On August 5, Father filed a petition for contempt finding against Shestak and to remove her from the case.[2] He also filed a Trial Rule 60(B)(1) motion for relief from judgment or, in the alternative, to modify parenting time under the agreement. Under the former, he specifically sought relief from or modification of the provision requiring Norman Glass *and* Joan Nusbaumer to supervise parenting time. Father claimed it was his intent and understanding that supervision was to be performed by Glass *or* Nusbaumer. In the motion, Father further asserted, "unsuspectedly, [Mother] through Christina Shestak has taken the position that both Norman Glass and Joan Nusbaumer must be present as the Supervisors for [Father] to have supervised parenting time". *Appellant's Appendix* at 44.

The trial court held an evidentiary hearing on all pending matters on September 17 and December 15, 2010. Between these two dates, Mother filed a motion for appointment of a guardian ad litem (GAL). Over Father's objection, the court appointed a GAL on November 3.

Following the December hearing, the trial court issued an order, on December 20, quashing the subpoena issued to Shestak by Father, denying the petition for contempt against

---

[2] A copy of this filing is not included in the appendices filed by the parties. The record establishes that Shestak retained counsel and filed a motion to quash subpoena and a request for a protective order, as well as a request for a hearing.

6

Shestak and to remove her from the case, prohibiting the recording of family therapy sessions without the written authorization of all present, and finding that Father violated HIPPA by secretly recording the counseling sessions. Further, the court ordered Father to pay Shestak's attorney fees in the amount of $3403.60.

On December 21, the trial court issued a temporary order regarding supervised parenting time, as agreed by the parties at the prior hearing. Accordingly, Father was granted parenting time on five different days (December 23 and 24, January 8 and 22, and February 5) for three to four hours each. Two supervisors were required to be present during parenting time, one selected by Father and one selected by Mother. Further, the order provided that Shestak and Dr. Davidson would remain involved in the post-dissolution matter. A status hearing was scheduled for February 7, 2011.

Following the February status hearing, the court issued another temporary order increasing by one hour each period of supervised parenting time, which was set at about twice a month. The court scheduled a hearing "on the issue of parenting time" for April 21, 2011. *Appellant's Appendix* at 64. The hearing was ultimately delayed until November 2, 2011.

In the interim, Father filed a motion for C.G. to see Dr. Davidson. Mother objected and noted that the GAL had previously proposed a joint session between Father, C.G., Shestak, and Dr. Davidson. The court agreed with Mother and ordered a joint session, which the court viewed as "more likely to be emotionally easier on the child and therefore more in the child's best interest". *Id*. at 72. The joint session occurred in April. Dr. Davidson subsequently filed a report with the court, the parties, and the GAL providing a number of

7

recommendations regarding future family therapy and indicating some concern with the therapy provided by Shestak. In sum, he stated that he saw no benefit to C.G. for his continued involvement in "so called family sessions" and no benefit in further communication with Shestak. *Id*. at 75.

On June 22, 2011, Mother and Father agreed with the GAL's recommendation to switch to Dr. Therese C. Mihlbauer for family therapy. After meeting with Father on October 21, however, Dr. Mihlbauer advised the GAL that she was not willing to work with Father "given his current mindset" and indicated that Father should not be seen for therapy with his child.[3] *Exhibits* at 73.

On November 2, 2011, the court held an evidentiary hearing on Father's request for "the expansion of parenting time." *Transcript* at 122-23. When the court indicated at the beginning of the hearing that it believed Father was the moving party for change and that he should go first, Father did not object. Rather, he proceeded with the presentation of his evidence in support of increased parenting time. Father acknowledged on cross examination that he does not trust Shestak, Dr. Mihlbauer, or the GAL. He believes no change is needed on his part and that C.G. has been brainwashed by Mother and is not in a fragile, psychological state as represented by others.

At the hearing, Mother requested that the supervised parenting time remain the same (a four to five hour period every other week) until the professionals involved in the case advised otherwise. Mother also requested attorney and witness fees incurred since Father's

---

[3] Dr. Mihlbauer gave a detailed list of reasons for her refusal.

contempt filing against her in July 2010. Mother claimed that the contempt filing was frivolous and noted that she also incurred fees as a result of his filings with regard to Shestak and the instant hearing on the expansion of parenting time. Mother testified that paying the fees was difficult for her, detailing her current financial situation.

In addition to her own testimony, Mother called Dr. Mihlbauer, Dr. Gregory Sowles, Shestak, and the GAL as witnesses. Dr. Sowles, the original custody evaluator who prepared psychological evaluations of the parties, opined that C.G. had a genuine fear of Father that was not coached. Dr. Sowles described it as "a global sense of anxiety where her dad is concerned." *Transcript* at 205. Shestak and the GAL both testified that C.G. continues to exhibit great fear of Father and that in their opinion C.G. cannot emotionally handle more parenting time with Father yet. Both felt that an increase in the parenting time schedule could significantly impair the child's emotional development given her high level of anxiety and Father's demonstrated unwillingness to change.

The trial court took the matter under advisement and issued its order on November 21, 2011. In its lengthy order, the court ultimately found:

> "based upon the testimony of Dr. Therese Mihlbauer, Dr. Greg Sowles, Christine Ottaviano Shestak, and [the GAL], that it is in the best interest of the parties' minor child to deny [Father's] request to modify parenting time, and that any expansion of parenting time might significantly impair the child's emotional development."

*Appellant's Appendix* at 18. Thus, the order maintained the status quo, including the requirement of two supervisors during Father's parenting time. Citing Ind. Code Ann. § 31-17-4-3 (West, Westlaw current with all 2012 legislation), the court also ordered Father to pay Mother's attorney fees ($8360.04) and witness fees ($6195.00), as well as one-half of the

GAL fees. Father now appeals, challenging only the award of attorney fees and witness fees.

I.C. § 31-17-4-3 provides:

(a) In any action filed to enforce or modify an order granting or denying parenting time rights, a court may award:
      (1) reasonable attorney's fees;
      (2) court costs; and
      (3) other reasonable expenses of litigation.
(b) In determining whether to award reasonable attorney's fees, court costs, and other reasonable expenses of litigation, the court may consider among other factors:
      (1) whether the petitioner substantially prevailed and whether the court found that the respondent knowingly or intentionally violated an order granting or denying rights; and
      (2) whether the respondent substantially prevailed and the court found that the action was frivolous or vexatious.

This statute is discretionary and allows the court to consider an unlimited number of factors. In assessing the award of attorney and litigation expenses, the court may consider such factors as the respective economic conditions of the parties, whether misconduct of one party resulted in the other party incurring additional fees, and other factors which bear on the reasonableness of the award. *Meade v. Levett*, 671 N.E.2d 1172 (Ind. Ct. App. 1996). The court, however, is not required to give a reason for its decision to award fees. *Holmes v. Holmes*, 726 N.E.2d 1276 (Ind. Ct. App. 2000), *trans. denied*. We will reverse a trial court's decision in this regard only if the award is clearly against the logic and effect of the facts and circumstances before the court. *Meade v. Levett*, 671 N.E.2d 1172.

The essence of Father's appellate argument is that I.C. § 31-17-4-3 is not applicable in the instant case because he never *filed* a request to modify or enforce an order regarding parenting time. If Father's contempt filings against Mother and Shestak, his petition to remove Shestak from the case, his "60(B)(1) Motion for Relief from Judgment or

10

Alternatively, to Modify Section VIII Parenting Time/Parental Access",[4] and his subsequent litigation at the November 2011 hearing regarding the expansion of parenting time do not constitute actions filed to *enforce or modify* the existing parenting time order, we do not know what they are.[5] In fact, in his written argument filed with the trial court following the November hearing, Father requested that the court "institute immediately unsupervised parenting time for a short phase-in period followed by the implementation of the Indiana parenting time guidelines for visitation with a child 5-years and older". *Id.* at 93.

The record reveals that the November 2, 2011 hearing was conducted with Father as the moving party on the issue of his request for expanded parenting time as contemplated by the original decree. Regardless of Father's assertion regarding the state of the pleadings, he cannot reasonably claim that he was not seeking enforcement or modification of his parenting time rights throughout this process, which entailed multiple hearings, two temporary orders regarding parenting time, and a final order. Accordingly, the trial court had authority to award reasonable attorney fees, court costs, and other reasonable expenses of litigation pursuant to I.C. § 31-17-4-3.[6]

---

[4] *Appellant's Appendix* at 43.

[5] Father's objection to allowing the testimony of Dr. Sowles at the November 2011 hearing indicates that Father was seeking to modify parenting time. Father's counsel argued:

> Judge, it would be just as much relevant if you had a custody evaluation. You have a determination and then you have a petition for change of custody. Then are you going to go back behind the decree and bring in the original determination as to the custody? No. You go from the date of the order forward. [Dr. Sowles] doesn't have anything to give us relevantly because he hasn't seen anybody in three years.

> *Transcript* at 195.

[6] We note that Father's reliance on *Beeson v. Christian*, 583 N.E.2d 783 (Ind. Ct. App. 1991) and *Mehl v. Mehl*, 699 N.E.2d 787 (Ind. Ct. App. 1998) is misplaced. These cases involved the review of modification of custody and visitation in the limited context of the custodial parent's filing of a petition to relocate. In

We now consider whether the trial court abused its broad discretion by awarding attorney and witness fees to Mother. On appeal, Father argues only that the factors expressly listed in I.C. § 31-17-4-3(b)(1) and (2) are inapplicable to this case. He ignores, however, that these factors are nonexclusive and that an award of fees may be premised on other factors.

In the instant case, the trial court did not explain the basis of the award of fees to Mother. Thus, we look to the record to determine whether the award is clearly against the logic and effect of the facts and circumstances before the trial court. At the final hearing, Mother testified briefly regarding her financial situation and indicated that it is difficult for her to pay the attorney and witness fees that have accumulated during the post-dissolution proceedings. Further, the record indicates that Father's unauthorized recording of the June 2010 family therapy sessions, in violation of HIPPA, is what led to the temporary cessation of family therapy sessions, delay in supervised parenting time, and the flurry of filings immediately following entry of the dissolution decree.

Finally, although we agree with Father that his basic action to obtain additional parenting time was not frivolous, some of his filings were. Of particular note, we observe that there was no basis for his 60(B)(1) Motion for Relief from Judgment or Alternatively, to Modify Section VIII Parenting Time/Parental Access, which was filed only one month after the decree was entered. The record clearly establishes that the number of supervisors to be

_Beeson_, the court observed that "matters of custody and visitation will necessarily arise" when such a petition is filed and that "this does not change the gravamen of the action". _Beeson v. Christian_, 583 N.E.2d at 790. The relocation statute expressly limited the award of attorney fees in such cases to cases of "extreme hardship." _Id_. In the instant case, the trial court was not so limited.

present during parenting time was a negotiated term in the settlement agreement of which Father was well aware.[7] Thus, Father's claim that it was his "intent and understanding" that only one of the supervisors needed to be present and that Mother and Shestak "unsuspectedly" took a contrary position is spurious. *Appellant's Appendix* at 44. Father's contempt actions against Mother and Shestak were also dubious.

In sum, Father has failed to establish an abuse of discretion regarding the award of attorney fees and witness fees pursuant to I.C. § 31-17-4-3.[8]

Judgment affirmed.

MAY, J., and BARNES, J., concur.

---

[7] During negotiations, when Father suggested changes regarding the provision establishing supervisors, Mother's counsel advised in a letter dated June 18, 2010:

> Page 3, paragraph VIII: Please be advised that I inserted the following language: "Any supervised parenting time shall initially be in a community setting and in the presence of Norman Glass and Joan Nusbaumer as the supervisors." At the hearing, you advised me that [Father] agreed to utilize Norman Glass and Joan Nusbaumer jointly as the supervisors. My client is not willing to agree to insert the language of Norman Glass or Joan Nusbaumer as the supervisors.

*Exhibits* at 36. Mother's counsel provided Father with the revised agreement, which had been signed by Mother. Despite arguing with Mother about this issue at the end of the June 22 family therapy session, Father executed the agreement as drafted by Mother's counsel on June 30, 2010.

[8] We reject Mother's passing invitation to sua sponte assess appellate attorney fees under Indiana Appellate Rule 66(E).